|  |  |
|---|---|
| RAMESH SHARMA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No. 1:10-cv-1033(GK) |
|  | ) |
| DISTRICT OF COLUMBIA, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## MEMORANDUM OPINION

Plaintiff Ramesh Sharma ("Plaintiff" or "Sharma") brings this suit against his former employer, the District of Columbia ("Defendant" or "the District"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; and the District of Columbia Whistleblower Protection Act ("DCWPA"), D.C. Code § 1-615.51.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [Dkt. No. 96] and Defendant's Cross Motion for Summary Judgment [Dkt. No. 107]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 100, 110-2], Replies [Dkt. Nos. 104, 113], Plaintiff's Notice of Supplemental Authority [Dkt. No. 120], and the entire record herein, and for the reasons stated below, Plaintiff's Motion for Partial Summary

Judgment shall be **denied** and the District's Cross Motion for Summary Judgment shall be **granted in part** and **denied in part**.

## I. Background

### A. Factual Background[1]

Sharma, a United States citizen of Asian-Indian origin, was previously employed by the District of Columbia's Office of Contracting & Procurement ("OCP" or the "Agency") as a Senior Contract Specialist in the Construction Design and Building Renovation ("CDBR") Group. See Def.'s Resp. to Pl.'s Statement of Material Facts ("SOMF") ¶ 8 [Dkt. No. 100].

Sharma alleges that, at his initial interview for this position in January 2003, Karen Hester ("Hester"), the hiring official and then-Manager of Contracting, "asked [him] if he was willing to do all types of work she would assign him, including clerical, typing, and filing work, because she thought most people from his part of the world (South Asia), like India, Pakistan, and Bangladesh[,] were very lazy and made poor supervisors or leaders[.]" Third Amended Complaint ("TAC") ¶ 11 [Dkt. No. 50]. The District denies this allegation. Answer to TAC ("Answer") ¶ 11 [Dkt. No. 52].

---

[1] Unless otherwise noted, the facts are undisputed and drawn from either the pleadings or the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).

In any event, Hester hired Sharma, who was 64 years of age at the time, and, on May 26, 2004, she evaluated his performance as "outstanding" in four out of five performance categories. She elaborated that:

> [Sharma] brings a vast amount of knowledge and experience in contracting . . . . He is extremely diligent, does not need supervision and exercises a high degree of judgment in carrying out assignments that are sensitive and highly visible.

Ex. to Def.'s Opp'n (performance evaluation dated May 26, 2004) [Dkt. No. 100 at ECF pp. 77-78]. In the "Personal Relations" category, however, Hester judged Sharma to be only "satisfactory"/"acceptable," and she cautioned that he "should be careful not to offend others in his zeal for timeliness and thoroughness." Id.

In June 2005, Hester again issued Sharma a glowing performance evaluation, rating him as "outstanding" in four out of five categories and observing that he "is proactive in analyzing and resolving problems" and "takes the initiative to do all that he can do to complete a project or assignment in a timely manner, including hours of work without compensation." Ex. to Def.'s Opp'n (performance evaluation dated June 2005) [Dkt. No. 100 at ECF pp. 79-80]. She opined again, however, that Sharma's "Personal Relations" were only "satisfactory" and

she indicated that he "needs improvement" in cooperating with his co-workers. She explained:

> In his zeal for timeliness, thoroughness and integrity Mr. Sharma has offends [sic] internal and external customers on occasion. In this regard, Mr. Sharma must improve the content and tone of his communications with internal and external customers.[2]

Id.

Sharma's relationships with customers did not, however, improve. Sharma contends that the reason for the lack of improvement was that his supervisors, co-workers, and customers repeatedly "pressured" him to find ways to "bypass the District's procurement regulations" and "rubber-stamp" inflated and wasteful contracts, which he refused to do. See generally TAC ¶ 18. He alleges, for example, that he refused an influential lobbyist's demand that he process a $1 million claim evaluated to be "worth only about $100,000, not about $1 million, as claimed by the contractor[,]" because the contractor "failed to provide the required justification [and] proof of costs[.]" Id. ¶¶ 14-16. He also objected to alleged "[e]fforts by [OCP Deputy Director, Peter May, and OCP Project Manager,

---

[2] Hester appears to have used the term "internal customers" to refer to employees of District of Columbia agencies other than OCP and the term "external customers" to refer to contractors and other non-District of Columbia persons. See Pl.'s Mot. Ex. 10 (deposition tr. of Karen Hester ("Hester tr. I")) at 103:7-10 [Dkt. No. 96-13].

Tony Esse] to steer [a] Conceptual Design contract for the Consolidated Forensics Lab (CFL) project to a pre-selected contractor at highly inflated prices[.]" Id. ¶ 18. In addition, he complained about a Department of Health official's alleged attempt to coerce him into ignoring procurement rules and a general lack of "cost control on many of the . . . contracts administered by Mr. Esse." Id.

On July 11, 2005, Sharma filed his first "whistleblower complaint" with the D.C. Auditor and D.C. City Council, complaining of these and other alleged violations. Id. On March 17, 2006, he filed several more "whistleblower complaints" of the same type with the D.C. Inspector General's Office, the D.C. Auditor, and the D.C. City Council. Id. ¶ 30. His co-workers and supervisors, in turn, complained that he was "not helpful" and requested that he be removed from certain projects. Id. ¶¶ 26, 29, 30.

In August 2006, after Sharma refused to comply with an order from Ms. Hester to "do whatever [Deputy Director May and Project Manager Esse] want you to do to process" certain contracts, Hester issued him a letter of admonishment stating, among other things, that he had "poor customer relations," exhibited "disruptive behavior," and was insubordinate. Id. ¶¶ 58-60, 67, 68. Thereafter, on October 18, 2006, Sharma filed

additional complaints with the D.C. Mayor's Office, the United States Department of Justice, the D.C. Inspector General, the D.C. Auditor, the United States Equal Employment Opportunity Commission ("EEOC") and the D.C. Office of Human Rights alleging retaliation, discrimination, and violations of federal and D.C. whistleblower and false claims laws.  Id. ¶ 69.

On December 12, 2006, Sharma again refused a direct order from Hester to process a major contract, this one related to the Anacostia Waterfront project, which he contended was "illegal" because "it involved millions of dollars of hidden equipment[.]" Id. ¶¶ 71-74.  The same day, Sharma submitted further complaints of ethical violations to the D.C. Auditor and the D.C. Office of the Inspector General.  Id. ¶ 75.  Hester subsequently removed him from the Anacostia Waterfront Project and the project was reassigned to another employee who, according to Sharma, had "no engineering background or experience" in complex design contracts.  Id. ¶ 78.

Sharma alleges that, in April 2007, in a meeting to discuss Sharma's multiple grievances, Hester told him:

> Ray, you are filing too many complaints with the IG, the Auditors [sic] office, EEOC, and the Mayor.  You are making the Mayor's office and other big bosses very mad.  They will get back at you and you are also making my job difficult. . . .  You need to be careful. . . .  It will take you nowhere . . . but trouble[.]

Id. ¶ 96. The District denies this allegation.

In June 2007, another supervisor, Diane Wooden, rated Sharma's performance as "unsatisfactory" in the "Personal Relations" category and only "satisfactory" in three of the five remaining performance categories. While Wooden acknowledged that Sharma had a "vast amount of experience and knowledge of [the] construction procurement processes," she observed that

> the positive aspects of his performance are marred by poor personal relations with customers and other stakeholders. Mr. Sharma is argumentative, condescending, and an obstacle to District employees who disagree with his perspectives and who are often seeking advice and assistance from OCP on the proper way to get contracts awarded. In fact, the quantity of work that is expected of an employee at his level is deficient because customers have complained and requested that Mr. Sharma not be assigned to their projects.

Ex. to Def.'s Mot. (performance evaluation, dated June 2, 2007) [Dkt. No. 100 at ECF pp. 81-82].

Sharma refused to sign this performance evaluation. Id. A few months later, in August 2007, he filed amendments to his EEOC complaint, complaining of, inter alia, "continuing acts of discrimination, harassment, hostile work environment, severe threats, [and] retaliation by Ms. Hester and Mr. Mack[.]" TAC ¶ 121.

The acrimony between Sharma and his supervisors continued in the same general pattern throughout the remainder of 2007, 2008, and early 2009. In the meantime, between November 2005 and June 2009, Sharma applied for 20 open supervisory and directorship positions within OCP but was not selected for any of them.

On March 4, 2009, the District's Chief Procurement Officer, David Gragan ("Gragan") announced that the CDBR group, where Sharma worked, would be transferred from OCP to the District of Columbia's Office of Property Management ("OPM"). In connection with this move, Sharma's colleagues in the CDBR group were transferred to other positions within OCP or were sent to the newly formed OPM construction contracting division. Sharma, by contrast, was not transferred to another position or sent to the newly formed OPM division.

On May 29, 2009, Sharma received a letter from Gragan, stating that, as a result of a reduction in force ("RIF"), he would be "separated from District government service effective 06/19/09." See Ex. to Def.'s Opp'n (letter from David Gragan, Chief Procurement Officer, to Ramesh Sharma, dated May 18, 2009 ("RIF notice")) [Dkt. No. 100 at ECF p. 59]. Sharma was the only member of the CDBR group who was separated from the District's employment as a result of the RIF. His separation

-8-

went into effect on June 19, 2009, at which time he was approximately 71 years old.

## B. Procedural Background

Sharma filed this lawsuit on June 18, 2010, asserting claims under the DCWPA and the False Claims Act, 31 U.S.C. § 3730(h). On September 1, 2010, the District filed a Motion to Dismiss the Original Complaint [Dkt. No. 5], which the Court denied on June 17, 2011 [Dkt. No. 21]. See Sharma v. Dist. of Columbia, 791 F. Supp. 2d 207 (D.D.C. 2011) ("Sharma I"). Sharma subsequently filed a Second Amended Complaint ("SAC") [Dkt. No. 42] on February 6, 2012, and a Third Amended Complaint ("TAC") [Dkt. No. 50] on March 28, 2012, adding claims under Title VII and the ADEA. On April 16, 2012, the District moved to dismiss Sharma's claim under the False Claims Act [Dkt. No. 53], which the Court granted on August 8, 2012. Sharma v. Dist. of Columbia, 881 F. Supp. 2d 138, 142-43 (D.D.C. 2012) ("Sharma II").

The parties conducted discovery from February 2012 through February 2013. See Scheduling Order dated Feb. 7, 2012 [Dkt. No. 43]; Minute Order dated Dec. 17, 2012; Order dated Jan. 28, 2013 [Dkt. No. 86]. During this time, it came to light that, whether intentionally or unintentionally, the District had failed to retain a great deal of relevant and discoverable

information, including "information pertaining to the selection of other individuals for positions Plaintiff has applied for, his performance record during the relevant period of time, and procedures and policies pertaining to the selection of applicants for positions in OCP and [OPM]." Order dated Jan. 15, 2013, at 2 [Dkt. No. 81].

The District conceded that its failure to preserve this information was a violation of the EEOC's record-keeping regulation, 29 C.F.R. § 1602.14. Id. at 3. Consequently, the Court awarded Sharma attorneys' fees and various discovery relief and ordered that, "as a sanction for failure to comply with Fed. R. Civ. P. 37(a)(3) and (4), the [District] will be deemed to have waived any privilege objections to any documents produced more than 14 days after issuance of this Order[.]" Id. at 6-7. The Court thereafter denied an oral Motion by the District to conduct additional discovery. See Order dated May 28, 2013 [Dkt. No. 91].

On August 12, 2013, Sharma filed his Motion for Partial Summary Judgment [Dkt. No. 96]. On September 4, 2013, the District filed its Opposition [Dkt. No. 100]. On September 19, 2013, Sharma filed his Reply [Dkt. No. 104].

On September 27, 2013, the District filed its Cross Motion for Summary Judgment [Dkt. No. 107]. On November 4, 2013,

-10-

Sharma filed his Opposition [Dkt. No. 110]. On December 5, 2013, the District filed its Reply [Dkt. No. 113]. On April 14, 2014, Sharma filed a Sur-Reply with permission of the Court [Dkt. No. 116]. Thereafter, on June 6, 2014, he filed a Notice of Supplemental Authority [Dkt. No. 120].

## II.  STANDARD ON SUMMARY JUDGMENT

Summary judgment may be granted only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248. The burden is on the moving party to demonstrate the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party,

-11-

and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The Supreme Court has consistently emphasized that the judge's function is not to "determine the truth of the matter, Liberty Lobby, 477 U.S. at 249, but merely to decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## III. DISCUSSION

In his TAC, Sharma brings claims for discrimination and retaliation under Title VII, the ADEA, and the DCWPA. Specifically, he contends that his separation in 2009, and the District's refusal to select him for the 20 supervisory positions to which he applied between 2005 and 2009, were each based on his race, age, and/or the fact that he was a whistleblower. See generally TAC ¶¶ 402-34.

### A. Legal Framework

Whether brought under Title VII, the ADEA, or the DCWPA, discrimination and retaliation claims such as Sharma's are subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII and ADEA retaliation claims); Czekalski v. Peters, 475 F.3d 360, 363

-12-

(D.C. Cir. 2007) (Title VII discrimination claims); <u>Payne v. Dist. of Columbia</u>, 722 F.3d 345, 353 (D.C. Cir. 2013) (DCWPA claim).

Under this framework, "a plaintiff must first establish a prima facie case of retaliation [or discrimination][.]" <u>Jones</u>, 557 F.3d at 677. To establish a prima facie case of discrimination, the plaintiff must show: "(i) that he [or she] belongs to a [protected class]; (ii) that he [or she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his [or her] qualifications, he [or she] was rejected; and (iv) that, after his [or her] rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1150 (D.C. Cir. 2004) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802). To establish a prima facie case of retaliation, the plaintiff must demonstrate that "(1) [he or] she engaged in a statutorily protected activity; (2) [he or] she suffered an adverse employment action; and (3) there is a causal connection between the two." <u>Carter v. George Washington Univ.</u>, 387 F.3d 872, 878 (D.C. Cir. 2004).

"If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a 'legitimate,

-13-

nondiscriminatory reason' for its actions." Jones, 557 F.3d at 677 (citation omitted). At the summary judgment stage, once the employer has presented such a legitimate, non-discriminatory reason, "'the burden-shifting framework disappears,'" id., and "the district court . . . proceed[s] to address 'one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee on [an invidious basis]?'" Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)). If so, summary judgment for the employer must be denied. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998).

## B.   Plaintiff's Motion

Sharma seeks summary judgment on seven Title VII and ADEA claims arising out of his failure to be selected for specific supervisory and directorship positions.[3]   He argues that he has

---

[3]   These positions were as follows: (1) Supervisory Contract Specialist, MS-1102-14, under Posting No. 2037, to which Sharma applied on November 1, 2005; (2) Supervisory Contract Specialist, OCP, MS-14, under Posting No. 5647, to which Sharma applied on February 12, 2007; (3) Supervisory Contract Specialist, MS-14, in OCP's "OCTO contracting group," under Posting No. 5677, to which Sharma applied on February 12, 2007; (4) Assistant Director, Procurement (OCP), MS 1101-16, under

-14-

made out a prima facie case of discrimination and retaliation by demonstrating that he was qualified and applied for each position but was ultimately rejected in favor of less qualified, younger individuals who were not Asian or whistleblowers. Pl.'s Mot. at 30-32. He contends that the District has failed to rebut this evidence with "a so-called legitimate reason" for not selecting him. Id. at 26, 34.

The District has, however, presented several legitimate non-discriminatory and non-retaliatory reasons for not selecting Sharma. Hester, who was the selecting official for at least two of the Supervisory Contract Specialist positions at issue, testified, that, "despite [Sharma's] technical expertise, I didn't feel that his interaction with the customers was what I wanted it to be" because he "[t]ended to be combative and argumentative and difficult." Pl.'s Mot. Ex. 10 (Hester tr. I) at 103 [Dkt. No. 96-13].

Hester also explained that she selected Karen Wooden instead of Sharma to fill one of the positions because she

---

Posting No. 8610, to which Sharma applied on December 12, 2007; (5) Assistant Director, Construction Contracting, MS-16, OCP, under Posting 9937, to which Sharma applied on April 2, 2008; (6) Supervisory Contract Specialist (Construction), MS-14, under Posting 12320, to which Sharma applied on December 12, 2008; and (7) Supervisory Contract Specialist (Construction), MS-14, under Posting No. 12923, to which Sharma applied on March 29, 2009. See Pl.'s Mot. at 34-43.

-15-

thought Wooden was "better qualified," meaning that she had "[t]he ability to get along with others [and] respectfully disagree with customers." Id. at 105. She explained that she selected another employee, Geoffrey Mack, to fill the second position because he had a "vast amount of experience," id. at 208, and, unlike Sharma,

> had a non-emotional analytical approach to dealing with [customers]. [Mack] understood what I was looking for. He didn't have a problem conferring with me or, you know, turning certain issues over to me for resolution if he had a problem. In other words, he supported the manner in which I wanted to manage the office.

Id. at 201.

Hester also stated, more generally, that Sharma was "disruptive" and "uncooperative" and that she had communicated to him on several occasions, without effect, that "[h]e needed to learn how to appropriately deal with our customers[.]" Ex. to Def.'s Opp'n (deposition tr. of Karen Hester ("Hester tr. II")) at 164-68 [Dkt. No. 100 at ECF pp. 65-69]; see also Hester tr. I at 217-18 [Dkt. No. 96-13].[4]

Similarly, Diane Wooden, who became Plaintiff's supervisor upon her promotion in 2006, testified that, although Sharma was

---

[4] In addition, as Sharma concedes, the fact that Hester hired him in the first place "is probative evidence against the claim that [she] harbored a general animus" against him on the basis of his age or race. Pl.'s Reply at 10.

-16-

"very knowledgeable," his "overall attitude and condescending ways and disruptive behavior sort of muddled his experience and knowledge." Ex. to Def.'s Opp'n (deposition tr. of Diane Wooden ("Wooden tr.")) at 35-36 [Dkt. No. 100 at ECF pp. 87-88].

Sharma's personnel records also support this general assessment of his performance. Both Hester and Wooden completed performance evaluations opining that his abrasive manner and "poor personal relations" with customers and co-workers prevented him from being successful on the job. See Ex. to Def.'s Opp'n (Performance Evaluations dated June 2005 and June 2, 2007) [Dkt. No. 100 at ECF pp. 79-82].

Furthermore, on February 8, 2006, Kevin Donahue, a Special Assistant in the District's Department of Transportation, sent Hester an email complaining that Sharma "displayed a stunning lack of professionalism in how he handled disagreements with staff at the RFQ process today." Def.'s Mot. Ex. G [Dkt. No. 107-11]. Donahue went on to state that:

> [w]ithin the first ten minutes of the meeting today, [Sharma] threatened (in fact declared) that he was going to report the team to the IG on several occassions [sic] . . . and called the group a zoo. Since I'm not familiar with the process, I really don't know who was right or wrong on the issues, but what I do know is that under no circumstances should the OCP representative have responded . . . with such a complete disregard for processional decorum. It made it impossible to move forward until he was removed.

-17-

Id.

Indeed, Sharma's interpersonal issues appear to have been such a concern to Hester that, in August 2006, she issued him a formal admonition stating that "despite repeated counseling," he continued to "display disruptive and inappropriate behavior with me, your peers, and OCP customers," which included "insulting, accusatory, and threatening comments and outbursts." Def.'s Mot. Ex. F (Formal Admonition, dated Aug. 25, 2006) at 1 [Dkt. No. 107-10]. Hester explained that such conduct "has resulted in poor customer relations, lack of timely progress on critical procurement actions, and disruptions in the operations of the Construction, Design, and Building Renovations group (CDBR)." Id.

Finally, Wilbur Giles, OCP's Chief of Staff and one of the hiring officials for several of the positions at issue, testified that, in his opinion, Sharma was only a "mediocre performer" because he thought himself superior to everyone else, "portrayed an imbalanced thought process[,]" and "failed to understand the type of leadership potential that the organization was looking for." Def.'s Mot. Ex. E (deposition tr. of Wilbur Giles ("Giles tr.")) at 152, 219, 220.

Sharma argues that this evidence is insufficient to survive summary judgment because the District's failure to retain relevant personnel records warrants an inference that the missing records support his claims of discrimination. Pl.'s Mot. at 32-34. Such an inference, however, is merely a relevant consideration for the trier of fact; it does not warrant the entry of summary judgment where, as here, there is admissible evidence that the employer had a legitimate, non-discriminatory basis for its actions. See, e.g., Talavera, 638 F.3d at 311-12 (reversing summary judgment because permissive adverse inference resulting from record destruction created genuine fact issue); Gerlich v. U.S. Dep't of Justice, 711 F.3d 161, 170-73 (D.C. Cir. 2013) (same).

Sharma also contends that summary judgment must be granted because the witness who testified for the District pursuant to Fed. R. Civ. P. 30(b)(6) did not know the specific reason he was not selected for each of the seven positions at issue. Pl.'s Reply at 3-4. He fails to cite a single case, however, holding that an employer's evidence of a legitimate nondiscriminatory reason for its actions must be in the form of Rule 30(b)(6) testimony as opposed to other competent evidence produced in

discovery.[5] Nor must the District produce evidence "that the person selected [in each case] was better qualified than [Sharma]." St. Peter v. Sec'y of Army, 659 F.2d 1133, 1138 (D.C. Cir. 1981). Instead, it must merely "bring forth evidence that [it] acted on a neutral basis," id. (citation omitted), which the District has done with evidence of Sharma's argumentative, antagonistic style and interpersonal issues.

In sum, the District has presented more than sufficient evidence for a jury to conclude that Sharma was not selected for the positions at issue because of his combative and abrasive communication style and general inability to work with others, rather than his race, age, or "whistleblower" status. Any adverse inference arising out of the District's failure to retain relevant documentary evidence is merely an additional consideration to be submitted to the trier of fact. Sharma's Motion for Partial Summary Judgment shall, therefore, be **denied.**

## C. The District of Columbia's Motion

The District has also moved for summary judgment on each of Sharma's claims. It advances two arguments: first, that

---

[5] The cases on which Sharma relies concern, almost exclusively, discovery sanctions under Fed. R. Civ. P. 37. These cases are inapposite because Sharma has not moved under Rule 37 to preclude the testimony of Hester, Wooden, or Giles or to bar introduction of the personnel records memorializing their complaints about his interpersonal issues.

$-20-$

Sharma's DCWPA claim is time-barred, and second, that his claims of discrimination and retaliation are not supported by the evidence in the record. The Court considers these arguments in turn.

### 1. Plaintiff's Claim under the DCWPA

The DCWPA, D.C. Code § 1-615.51, provides that "[a] supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order." D.C. Code § 1-615.53. Employees seeking to enforce their rights under the DCWPA must file their case "within 3 years after a violation occurs or within one year after the employee first becomes aware of the violation, whichever occurs first." D.C. Code § 1-615.54(a)(2). As the Court has previously observed, "[t]here is no dispute that the one year statute of limitations applies to this case[.]" Sharma I, 791 F. Supp. 2d at 214.

Sharma's DCWPA claim is based on his separation under the RIF, which went into effect on June 19, 2009. See Pl.'s Opp'n at 28. He filed this case on June 18, 2010. Therefore, if his claim accrued on the date his separation went into effect, as he argues, the claim is timely, having been filed on the last day

of the limitations period. If, however, the claim accrued any time before that, as the District argues, it is time-barred.

As the Court held in Sharma I, a DCWPA claim accrues when the employee learns "'of the discriminatory act, not [when] the consequences of the act become painful.'" Sharma I, 791 F. Supp. 2d at 214 (emphasis in original) (quoting Stephenson v. American Dental Ass'n, 789 A.2d 1248, 1250 (D.C. 2002)). Consequently, the relevant question is when Sharma obtained "'final, unequivocal, and definite' notice" of the District's purportedly retaliatory act even if "the effective date" of the retaliatory decision occurred later. Id. (citing Del. State College v. Ricks, 449 U.S. 250, 259 (1980); Cesarano v. Reed Smith, LLP, 990 A.2d 455, 465 (D.C. 2010)).

The District argues that the RIF notice gave Sharma "final, unequivocal, and definite notice" of his separation, and therefore that his DCWPA claim accrued no later than May 29, 2009, when he received the notice. Def.'s Mot. at 9-11.[6]

---

[6] Sharma initially stated in his TAC that he received the RIF notice "on or about May 29, 2009." TAC ¶ 340. He has now submitted an affidavit declaring that, although he first saw the notice on May 29, 2009, he refused to sign for it without a union steward present and, therefore, did not read it until June 3, 2009. See Pl.'s Opp'n Ex. 72 (Affidavit of Ramesh Sharma ("Sharma Aff.")) ¶ 3. Whether Sharma first had notice of his impending separation on May 29 or June 3 is immaterial to the timeliness of his claim because he did not file this case until June 18, 2010 – more than a year after both dates.

Sharma counters that the RIF notice did not provide final and unequivocal notice of his claim because he "could have obtained another position in the D.C. Government before his RIF became final." Pl.'s Opp'n at 30. His theory is that the retaliatory act was not merely his impending separation under the RIF (which applied to the entire CDBR group), but rather such separation in conjunction with the Agency's failure to reemploy him in a new position. Specifically, he alleges that the District "moved other similarly situated employees from the . . . abolished CDBR group to positions in other groups" but refused to move him. TAC ¶ 390. Under this view, even if the RIF notice was final and unequivocal as to the elimination of his position in the CDBR group, his claim did not accrue until he learned that he was to be treated differently than other CDBR employees subject to the RIF (i.e., not reassigned to or reemployed in a new position).

However, even if, Sharma's claim did not accrue until he learned the District was treating him differently from other CDBR employees by refusing to reassign him to a new position, it is undisputed that he knew as much by June 11, 2009. On that date, he forwarded a memorandum to the offices of the D.C. Inspector General and the D.C. Government Auditor titled "Formal Complaint of Outrageous Behavior and Illegal Retaliation . . .

-23-

Leading to My job Loss for Whistleblowing, etc. – REQUEST FOR PROTECTION[.]" See Def.'s Reply Ex. A [Dkt. No. 113-1] (emphasis in original). In this memorandum, Sharma specifically complained, not only that his position was being cut under the RIF, but also that he had been "illegally FORCED-OUT/RIF'ed with a severe and adverse impact on of [sic] losing my job as the only SINGLE employee in the group . . . all because of my trying to do an 'HONEST' job for the Government." See Def.'s Reply Ex. A [Dkt. No. 113-1] (emphasis added). He stated further that "OCP+OPM refuses [sic] to consider me under 'Priority/RIF' status for many vacancies for which I am, not just minimally, but HIGHLY qualified." Id. (emphasis added).

This evidence removes any doubt that, no later than June 11, 2009, Sharma knew or believed that: (1) he was being treated differently than other employees in the CDBR group, (2) the District was refusing to reassign him to other vacancies as it had with other members of his group, and (3) the RIF would lead to his final separation from the District's employment.[7]

---

[7] Sharma has submitted an affidavit stating that until "late June or early July" 2009, he did not completely understand the RIF's effects on other CDBR employees and did not "fully realize" that he had been discriminated against. Pl.'s Opp'n Ex. 72 (Sharma Aff.) ¶¶ 14-16. But the date on which Sharma "fully realize[d]" he was a victim of discrimination is not important. See e.g., Fortune v. Holder, 767 F. Supp. 2d 116, 122 (D.D.C. 2011) ("Notice or knowledge of discriminatory motivation is not a

Consequently, even if the Court were to apply the accrual theory urged by Sharma, there is no genuine dispute that his claim accrued, at the latest, by June 11, 2009. Sharma did not file this case until June 18, 2010, more than one year later. Therefore, his DCWPA claim is time-barred and Defendant's Motion for Summary Judgment on Count 1 shall be **granted.**

## 2. Plaintiff's Claims Under Title VII and the ADEA

The District next argues that summary judgment should be granted in its favor on Sharma's Title VII and ADEA claims because Sharma "can present no evidence that the District's [non-discriminatory, legitimate] reasons for the non-selections were pretextual[.]" Def.'s Mot. at 20-21.[8] Sharma has, however,

---

prerequisite for a cause of action to accrue.") (citation and punctuation omitted). What is important is the date Sharma knew the District was "refus[ing] to consider [him for reassignment] under 'Priority/RIF' status," which the undisputed evidence shows to be no later than June 11, 2009.

[8] The District also contends that Sharma has not made out a prima facie case. Def.'s Mot. at 11-16. Our Court of Appeals has consistently held that where, as here, an employer has asserted a legitimate, non-discriminatory reason for the adverse employment decision, "the district court need not - and should not - decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas" but rather should focus on whether the employee has "produced sufficient evidence for a reasonable jury to find . . . that the employer intentionally discriminated [or retaliated] against the employee[.]" Brady, 520 F.3d at 494 (emphasis in original) (citations omitted); see also Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014). Consequently, the Court does not consider whether Sharma has made out a prima facie case.

-25-

presented evidence from which a jury could find that the District's failure to select him for various positions, as well as its ultimate decision to terminate him in 2009, were not based on his interpersonal issues but rather on his race, age, and/or "whistleblower" status.

First, it is undisputed that all of the positions to which Sharma applied were filled by employees who were younger than Sharma, were not of Indian or Asian descent, and had not filed any complaints. See, e.g., Def.'s Resp. to Pl.'s SOMF ¶¶ 22, 38, 52, 79, 85, 88, 96, 110, 114, 124, 154.

Second, as to race/national origin discrimination, Sharma has submitted a sworn statement that, at his initial interview in January 2003, Hester told him "she thought most people from his part of the world (South Asia), like India, Pakistan, and Bangladesh[,] were very lazy and made poor supervisors or leaders[.]" TAC ¶ 11.[9] Sharma has further sworn that, during his tenure at OCP, he "observed that Ms. Hester constantly harassed [a Bangladeshi employee], and finally forced [that employee] out of his supervisory job[.]" TAC ¶ 12. This

---

[9] Because the TAC is verified, it serves as a sworn statement of Sharma. See Neal v. Kelly, 963 F.2d 453, 457 (D.C. Cir. 1992) (treating verified complaint as an affidavit for purposes of summary judgment).

-26-

evidence establishes a genuine factual dispute as to whether Hester's treatment of Sharma, and in particular, her failure to select him for several supervisory positions, was motivated by a bias against South Asians.[10]

Third, as to age discrimination, Sharma has submitted a sworn statement that Hester told him not to apply for one of the Supervisory Contract Specialist positions because Geoffrey Mack, who was ultimately selected to fill the position, was "younger' [and] needed a break with a permanent promotion and a faster salary jump than Plaintiff." TAC ¶¶ 37, 42. There is also evidence that, in 2008, OCP's Chief Procurement Officer, David Gragan, opined that Sharma was "'too old' for [a supervisory] position" and had an "'old outdated vision, and outdated management experience.'" TAC ¶ 152. This evidence is sufficient to establish a genuine factual dispute as to whether Sharma's failure to be selected for a supervisory position was based on his age, rather than his interpersonal problems.

---

[10] The District argues that Hester's decision to hire Sharma in the first place refutes any inference that she discriminated against him on the basis of his age or race. Def.'s Opp'n at 6-7. This circumstance, while relevant, is countered by Sharma's direct evidence of discriminatory animus and is not, therefore, dispositive at the summary judgment stage. See, e.g., Czekalski, 475 F.3d at 368-69 (fact that supervisor hired plaintiff was "probative evidence against the claim that he harbored a general animus against" women but was not "alone sufficient to keep th[e] case from the jury").

Fourth and finally, as to retaliation, Sharma has submitted evidence that Hester told him he was "filing too many complaints" and "making the Mayor's office and other big bosses very mad" which would take him "nowhere . . . but trouble[.]" TAC ¶ 96. Similarly, he attests that, on or about July 16, 2007, Geoffrey Mack, "stalked [him], and yelled to him 'You . . . . damn it . . . Motherf*cker . . . . you have been calling and filing all these reports with the auditors . . . I am calling my mother [ex-D.C. Council Member Gladys Mack] right now and . . . . She will fire your ass[.]" TAC ¶ 110.

In addition, former OCP Assistant Director, Anthony Reed, has filed an affidavit stating that, in October 2008, Giles asked him to "terminate Sharma, effective immediately[.]" Pl.'s Mot. Ex. 3 (Affidavit of Anthony Reed ("Reed Aff.")) ¶ 3 [Dkt. No. 96-6]. Reed explains that Giles told him to watch out for Sharma because "[h]e'll document everything you say and then use it against you." Id. ¶ 4. Reed states further that he discussed Giles' request with Chief Procurement Officer David Gragan who told him that he was "was free to make [his] own decision regarding Mr. Sharma's continued employment[,]" but agreed with Giles that Sharma "was 'problematic' due to his numerous whistleblower and EEO complaints[.]" Id. ¶¶ 6-7. Based on all of this evidence, a jury could find that Sharma's

-28-

separation and non-selections were based on the numerous complaints he filed.

In sum, the record is sufficient for a jury to conclude that the District's adverse actions against Sharma were based on his race, age, and/or whistleblower status rather than his interpersonal issues, as the District contends. Therefore, the District's Motion for Summary Judgment shall be **denied.**

## III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment shall be **denied** and Defendant's Cross Motion for Summary Judgment shall be **granted** insofar as it pertains to Count 1 of the TAC and shall be **denied** insofar as it pertains to Counts 3-5 of the TAC. An Order shall accompany this Memorandum Opinion.

August 25, 2014

Gladys Kessler
United States District Judge

**Copies to: attorneys on record via ECF**

-29-